**CHARTER COMMUNICATIONS, INC., a Delaware corporation; Charter Communications Properties, LLC, a Colorado limited liability corporation; and Paul G. Allen, an individual, Plaintiffs,**

v.

**COUNTY OF SANTA CRUZ, Defendant.**

No. C 99–01874 WHA.

United States District Court, N.D. California.

March 7, 2001.

Ann E. Johnston, Richard R. Patch, A. Marisa Chun, Coblentz Patch Duffy & Bass, LLP, San Francisco, CA, for plaintiffs.

Dwight L. Herr, County Counsel, Samuel Torres, Jr., County Counsel of Santa Cruz, Santa Cruz, CA, William M. Marticorena, M. Katherine Jenson, Jeffrey Melching, Robert S. Bower, Rutan & Tucker, Costa Mesa, CA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL

ALSUP, District Judge.

### INTRODUCTION

In this case of first impression concerning the application of the 120–day rule under Section 617 of the Cable Television Consumer Protection & Competition Act of 1992, 47 U.S.C. 537, the issue is whether the County of Santa Cruz, California, unlawfully and unreasonably refused to consent to a change in ownership for a local cable franchise. Also presented is the question whether its refusals violated the First Amendment.

### PROCEDURAL HISTORY

This action commenced in early 1999. On November 12, 1999, the Court granted in part and denied in part the County's Rule 12 motion, dismissing plaintiffs' takings claim as unripe and their direct claims under Section 617 of the 1992 Cable Act, 47 U.S.C. 537, for lack of a private right of action. Plaintiffs were allowed to proceed on their claim for infringement of their constitutional free-speech rights under 42 U.S.C.1983 and their contract claim to enforce a franchise agreement promise not to "unreasonably refuse" to approve such transactions, a claim that indirectly takes into account any violations of the 120–day rule. *Charter Communications, Inc. v. County of Santa Cruz,* 74 F.Supp.2d 937 (N.D.Cal.1999). On January 11, 2001, the Court denied cross-motions for summary judgment. A bench trial began in late January. The trial concluded on February 15, 2001. The Court now makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

The parties have submitted voluminous proposed findings, and the Court has considered all of them. In the interest of clarity, however, this order focuses on the essentials. A number of proposed points, while arguably relevant and accurate, have been omitted as too distracting. That a finding has not been incorporated into this order does not mean that the Court rejected its accuracy. This order will cite the record as the exception and not the rule. For some exhibits, page cites are to the original page numbers and for others to Bates numbers, as convenient.

### The Parties

1. Formed in 1992, Charter Communications, Inc. ("CCI"), has been at all relevant times in the cable-television business, providing service through one or more operating subsidiaries, including Charter Communications Properties, LLC ("Charter"). The latter acquired a group of cable businesses in California in 1997–98, one of which operated in Santa Cruz County, namely, the so-called "south county franchise," covering unincorporated areas surrounding the cities of Capitola and Watsonville. By 1998, CCI was a nationally-ranked cable operator and had acquired 22 cable systems in the United States. In 1998, Paul G. Allen purchased CCI, including its subsidiaries, in a $4.5 billion nationwide transaction. Mr. Allen was the co-founder of Microsoft Corporation and is

wealthy. He paid cash for the Charter stock. Mr. Allen, CCI and Charter are the plaintiffs herein. They sued Santa Cruz County when it refused to approve the change in control for the local franchise in question. Whether that refusal was reasonable and lawful is the question presented. The County is the sole defendant.

### The History of Cable in Santa Cruz County

2. Topography has long made cable important in Santa Cruz County. The area is surrounded by mountains that block reception of over-the-air signals from major metropolitan areas such as San Jose and the Bay Area. Until recently, the quality of service of cable providers in the area has lagged behind other parts of the country.

3. To operate a cable business in Santa Cruz County, it was (and remains) necessary to obtain a franchise from the local franchising authority, as elsewhere in the United States. Here, that franchising authority was the county government. From time to time, the county government had been frustrated over the cable service in the area. In dealing with cable operators, the County had even been threatened with termination of cable services. At least one operator told local officials that it could not continue providing services due to financial stress.

4. One troublesome prior operator was Sonic Cable Television. Prior to May 19, 1998, it had the south county area. Its franchise had actually expired in or about 1982, but thereafter Sonic had continued to operate as a holdover tenant. Under its franchise, the County's consent was required for a transfer of ownership (TX 3).

### The Charter/Sonic Transaction

5. In 1997, an opportunity arose to improve conditions for the franchise. On August 19 of that year, Charter purchased Sonic's cable assets, including the south county operation. The Charter/Sonic transaction involved over forty cable television franchises located in two states, serving over 100,000 subscribers. Although the Charter/Sonic transaction is not at issue herein, it serves as important foundation, both sides assert, for the events that followed a few months later in the transaction that is at issue. By way of prelude, consequently, the following findings have relevance.

6. In September 1997, Charter and Sonic requested the County's consent to the transfer of the franchise. Federal law recognizes the power of local franchising authorities to approve or disapprove transfers but imposes certain restrictions discussed hereinafter. The FCC has promulgated a specific form to be used to seek approvals from local franchising authorities called Form 394. 47 C.F.R. 76.502. In the Charter/Sonic transaction, the parties submitted a Form 394 plus attachments to the County, which then requested and received additional voluminous supplemental information.

7. In the consent process, two individuals were the main actors for the County. One was Mr. Pat Busch, the assistant county administrative officer. He was schooled in cable issues. The County also retained Attorney William Marticorena, a private lawyer in Costa Mesa, California, to act as its special counsel. Mr. Marticorena was a graduate of Harvard Law School and specialized in cable law. For Charter, the individual primarily involved was Ms. Trudi Foushee, a vice president and senior counsel of the parent company CCI. All three were later leading actors in the CCI/Allen transaction. All three testified at trial.

8. The County was advised that CCI, the parent company, would manage the south county franchise area and was provided with information concerning CCI's technical qualifications to do so. The County did not ask for copies of employment contracts for CCI personnel or other evidence that CCI senior management would remain in place. The County did not ask any questions regarding the technical or financial qualifications of individual shareholders of CCI, or for a guaranty by individual shareholders, or for individual

employment contracts. These omissions arguably stand in contrast to affirmative inquiries made by the County in the later CCI/Allen transaction.

9. Two of the items provided to the County were a five-year projected income statement for Charter nationwide and a ten-year projected income statement for Charter allocated specifically for Santa Cruz County (TX 58 and TX 60). These projected income statements contained projected capital expenditures, including rebuild costs, and a footnote explaining how revenue, expense and capital items were allocated. The County did not ask any questions regarding the revenue-growth assumptions used therein.

10. Through Mr. Marticorena, the County served Charter with extensive information requests. After the County served on Charter its second information request (TX 30), the discussions shifted to what concessions the County wanted. Messrs. Busch and Marticorena made clear that any grant of a cable franchise to Charter would have to include, *at a minimum*, the following: (a) a commitment by Charter to construct or rebuild a state-of-the-art cable system (750 MHZ, two-way system), which would ensure a minimum of 61 channels; (b) an immediate reduction of existing subscriber rate levels plus a rate freeze until the system rebuild was completed, plus significant restrictions on Charter's ability to increase rates in the future; and (c) cash payments for what the County believed had been franchise violations by Sonic. The proposed rate order would have limited Charter's ability to increase rates as might otherwise be permitted under the applicable FCC rate regulations. Charter demurred.

11. Mr. Busch then sent Ms. Foushee a "draft staff report" and draft county board resolution recommending denial of the transfer (TX 20). Among other things, they stated that Charter had failed to provide critical information regarding its ability to receive an acceptable rate of return and that Charter did not have the qualifications to own or operate the cable system.

Viewed in the overall context of the negations, it seems clear that the County utilized the threat of a denial as a way to get Charter to accept its demands.

12. In the face of this threat, Charter acquiesced. An agreement resulted. On or about May 19, 1998, the County's board of supervisors adopted a resolution approving the transfer to Charter (TX 3). The parties entered into the following, which reflected various conditions imposed by the County for its consent: (a) a new franchise agreement; (b) a rate order; and (c) a transfer agreement.

13. The hard bargain was excellent for the County. The new franchise agreement required Charter, among other things, to construct, within 24 months, a two-way state-of-the-art cable system, and to offer a 61–channel "basic service tier," including 23 channels not previously available. It further required Charter to put up a $500,000 letter of credit and a one-million-dollar performance bond. It also provided for the County's recovery of liquidated damages of up to $2,500/day for material breaches (TX 3).

14. The rate order had, and still has, the effect of restricting Charter's ability to increase rates that might otherwise be permitted under applicable FCC rate regulations (TX 3 at 1864–71). The rate order included provisions requiring a basic-service rate plan which provided for an immediate rate reduction to subscribers, a ten-percent discount for low-income senior citizens and the disabled, a rate freeze for approximately two years during completion of the rebuild, a low "basic service rate" when the system rebuild was completed, lower than Sonic's former rates, on a per-channel basis, and a provision restricting Charter's ability to increase rates thereafter to the greater of either (a) 95% of the increase in basic service rates (weighted by system and by tier) in Los Angeles and Riverside systems (where there was "intense over the air competition") owned and operated by Charter entities or (b) 95% of the TCI regulated basic

service rates, plus $2.00 (TX 3 at 1864–65). Another effect of the rate order was that Charter was required to maintain its "cable programming service tier" as a part of the "basic tier," and to waive the federal deregulation of the "cable programming service tier" that went into effect in 1999. As a result, the County has further regulated an area of cable services that is not normally regulated in the country.

15. Piling guarantees on assurances, the transfer agreement finally included a further unconditional guarantee by parent CCI of Charter's performance of its obligations under the franchise agreement and County ordinance, and included an agreement to pay the County $75,000 (TX 3 at 1852, 1858). It also provided that a breach of the rate order or the transfer agreement would constitute a breach of the franchise agreement. The transfer agreement set forth, among other things, (a) a specific requirement that Charter submit a cost-of-service filing to the County, (b) the parties' agreement, in advance, to the County's adoption of the rate order (which, in the interim, Charter agreed to treat as a valid mutual contract), (c) Charter's waiver of any right to challenge or appeal the rate order, (d) Charter's agreement to accept the rate order as a lawful and fully binding cost-of-service rate order, (e) Charter's agreement to waive any right to file any further cost-of-service forms for the remainder of the franchise term (TX 3 at 1855–57).

16. At trial, the County asserted that the draft denial report had been no threat at all, but was legitimate ambivalence. It advanced reasons for its sending the draft and then reversing course. For example, the County knew, it claims, that Sonic had been levying a bogus possessory interest tax on its bills and collecting it from subscribers, even though no such tax in fact existed. The County also argued it had discovered that the acquisition would be routed through a Norwegian company. These were, the County claims, the real reasons for the denial recommendation. These were marginally plausible considerations. Ordinarily, a court should give the benefit of the doubt to the County on this point. Considering all the evidence and considering carefully the entire course of conduct, however, the Court finds that these considerations were make-weights and that the real reason for the denial recommendation was to use the County's power to deny as a basis for extracting concessions illegal under federal law, particularly as to the rate order. This also explains why Mr. Marticorena and Mr. Busch insisted on the extraordinary waivers in the final language, acquiesced in by Charter.

### The CCI/Allen Sale

17. With the foregoing history, we now turn to the transaction at issue, which followed the foregoing by only a few months. On July 29, 1998, Paul G. Allen contracted with CCI and others to purchase approximately 94% of the outstanding shares of CCI and certain of its affiliates as part of an approximately $4.5 billion acquisition (approximately $2.26 billion in cash and $2.2 billion in assumed debt) that would (and later did) result in a common ownership of all cable properties then managed by CCI under a single umbrella company. As a result, the ultimate corporate control of Charter was held by Mr. Allen, as the new majority shareholder of CCI.

18. Through the CCI/Allen transaction, Mr. Allen acquired controlling ownership interest in legal entities holding over 473 cable television franchises in eighteen states, serving over 1.2 million subscribers and more than 38,000 plant miles of coaxial and fiber-optic cable. In addition to being a co-founder of Microsoft, Mr. Allen was a director of various technology-related companies involved in the development of new technologies and the deployment of new services.

19. On July 30, 1998, Charter and CCI notified the County of the transaction and represented that CCI's existing senior management would continue as the senior management of the newly-consolidated companies. Charter, CCI and Mr. Allen

requested the County's consent to the change of control. Consent was required under the local cable ordinance, incorporated into the franchise agreement, but could not be "unreasonably withheld," a phrase that is the crux of the case (TX 2 at 900). They submitted an FCC Form 394 with attachments on August 18, 1998 (TX 6).

20. The cover letter from Charter's president and CEO, Mr. Jerald Kent, stated in part (TX 6 at 0762):

> You will be pleased to know that there will be no increase in debt-to-equity ratios of the entities as a result of this transaction. Mr. Allen will assume the current debt and in many instances liquidate some debt instruments. Notwithstanding the consumer benefit of this transaction, the effect of this transaction on you and your subscribers should be transparent for the most part. The current corporate staff and system management will remain under my leadership. And of course, Charter will retain its commitment to superior customer service.

21. The materials provided to the County as part of the Form 394 submissions supported the following facts:

(a) As a result of the transaction, Mr. Allen would become a majority shareholder and a chair of Charter's corporate parent, CCI.

(b) Following the close of the transaction, Charter (and not Mr. Allen or CCI) would continue, as before, to be the legal entity holding the franchise for the south county franchise area with no change in Charter's obligations thereunder.

(c) Charter would still be the legal title holder for the cable system serving the south county franchise area.

(d) The transaction was to be financed from Mr. Allen's personal assets, required no new debt to the Charter or CCI entities, and would not result in any increase in the debt to equity ratios of either Charter or CCI. In fact, the submission stated that Charter's existing debt would be reduced by $34 million.

(e) Charter and CCI had substantial experience owning and operating cable systems, and the management of the systems was to remain under Mr. Kent's personal direction.

(f) Mr. Allen and the sellers were contractually required (assuming the other conditions were satisfied) to close the transaction, if and when consents to the transfer of control had been obtained from local franchising authorities of franchises representing ninety percent of the total number of subscribers of the Charter entities, taken as a whole. Any delay of the closing past December 31, 1998, required a $100,000,000 reduction of the purchase price.

(g) Mr. Allen had fabled wealth and sufficient assets to close the transaction and to operate the nationwide system including the south county franchise area.

22. In sum, the transaction was structured without any increase in the debt-to-equity ratios of the Charter entities, CEO Kent represented he and other management would remain in place, and the previously-negotiated rights and obligations of the parties remained the same. The applicants simply wanted approval of the new majority shareholder.

### The County's Response

23. One of the key issues in this case is whether it was lawful for the County to respond to the change-of-control request by launching a wide-ranging investigation into what Mr. Allen might or might not make as a return on his stock investment in CCI over the years and whether he would eventually have incentives to try to increase rates and cut services. The County insists that its concern arose out of the fact that Mr. Allen seemed to be paying a high price for the nationwide enterprise, *i.e.*, a price at the high end of the market (or higher) for cable systems in general. If so, the County claims it feared Mr. Allen would cut back on local service

or try to increase local rates as a way to earn an "acceptable" rate of return. In contrast, plaintiffs contend that these fears were fanciful and mere pretexts for a hold-up, *i.e.,* the manufacturing of false or exaggerated concerns to trade off later for monetary or other illegal concessions.

24. In this context, the same teams acted for the parties as before. Mr. Marticorena and Mr. Busch were the primary bargainers for the County. Ms. Foushee negotiated for Charter.

25. Out of the approximately 497 local franchising authorities who received FCC Form 394 applications in connection with the CCI/Allen transaction, no more than ten percent requested additional information. Of those franchising authorities that did request additional information, the ones jointly represented by Mr. Marticorena, including Santa Cruz County, propounded the most lengthy requests. His was the only information request that sought information to determine what rate of return Mr. Allen would receive on his equity investment.

26. The Santa Cruz cable system had sold only months before (during the Charter/Sonic transaction) for a price of approximately $1,564 per subscriber, according to the Kagan financial data book, an industry publication read and relied on by those in the cable business. In contrast, the price per subscriber for the CCI/Allen transaction, as indicated in the Kagan financial data book, was $3,600. According to the Kagan financial data book, the $3,600 value per subscriber established for the transaction was the highest or most expensive price paid for any franchise nationwide. Also, the cash-flow multiplier for the CCI/Allen transaction was higher than industry averages at the time. The cash-flow multiplier for the transaction as indicated in the Kagan financial data book was fourteen, the highest cash-flow multiplier reported in 1998. This data was published by the time of the events in question.

27. Although it came to light only during discovery herein, a pre-transaction due diligence study prepared privately for Mr. Allen showed the same conclusions. It stated that the price for CCI was "above the high end" of the range of prices of comparable cable systems and that the purchase price per subscriber for the CCI/Allen transaction was the highest purchase price of any cable transaction in 1998, and one of the highest ever. It placed the cash-flow multiplier at fourteen as well. This study was done by Nations-Banc Montgomery Securities and will be referred to herein as the NMS report (TX 65).

28. Up to a point it would have been reasonable, therefore, to wonder, based on reliable industry sources, whether Mr. Allen was paying somewhat more than market value for the national cable system. It is true that a counter argument can be made, as Charter does, that Mr. Allen paid substantially less for the Charter subpart of the acquired enterprise (TX 55). Still, it was not unreasonable for the County to rely on the Kagan data. Whether, however, that concern should have translated into the far-ranging investigation that developed is a different question.

**The Demand for a Due Diligence Study**

29. Under FCC regulations, the Form 394 submission was "complete" as filed and the County has never contended otherwise. And, the Form 394 submission was thorough compared to the general practice in the cable industry. The FCC Form 394 materials submitted for the CCI/Allen transaction specifically informed the County that it had 120 days under FCC regulations (47 C.F.R. 76.502) to take action on the transfer application (TX 10).[1]

30. The first response by the County occurred on August 26, 1998, as part of a

---

**1.** It is because of Charter's express reference to the County's having 120 days to act that Charter must be deemed to have waived (or to be estopped from asserting) the shorter sixty-day deadline set by the local ordinance (TX 2 at 900).

group response by six LFAs. On that date, the County's special counsel, Mr. Marticorena, met with Charter on behalf of the County and five other franchising authorities in California represented by him. No other County representative was present. Charter was represented by Ms. Foushee.

31. It must be emphasized that this meeting and subsequent negotiations until December 1998 proceeded on a "group LFA" basis, *i.e.*, Mr. Marticorena acted for six California local franchising authorities with respect to the parallel change-of-control requests pending before each on the acquisition. At no time before December 1998 were there any specific communications limited to Santa Cruz County (except, of course, the initial Form 394 filing). Neither party ever objected to proceeding in this manner. Both sides evidently felt it was more efficient to proceed on a "group LFA" basis. For this reason, plaintiffs' argument that the County should have, on its own, pored over the earlier Charter/Sonic transaction filings in order to find answers to its CCI/Allen questions is simply unfair. Mr. Marticorena was acting for a group of LFAs. The entire group did not have the Charter/Sonic information. Prior to December, Charter never made reference to any Sonic filings as having the information requested.

32. During the August 26 meeting, Ms. Foushee explained the CCI/Allen transaction. She asserted that the CCI/Allen transaction would not affect rates. She further explained that, unlike many other transactions, because the transaction was required to close by year-end 1998, Charter and CCI could not agree to extensions of the time for the franchising authorities to complete their review of the consent requests. She stated that the Form 394 was complete and provided more than sufficient information.

33. During the meeting, Mr. Marticorena requested that Charter and Mr. Allen agree to pre-fund (*i.e.*, pay in advance) the costs of a "due diligence study" to be performed by a consultant hired by him to address the financial feasibility of the proposed transaction and the impact of the transaction on future rates. The consultant was William Morgan of Diehl, Evans & Co., LLP. He had performed at least one prior due diligence study for Mr. Marticorena.

34. At no time did Charter ever affirmatively agree, either at the meeting or thereafter, to provide or to fund such a report, or that it would be necessary, reasonable or lawful to require Charter to perform or fund such a report as a condition for its consent. Ms. Foushee, however, said she would "consider" the request. In follow-up conversations, Ms. Foushee equivocated. Although she told Mr. Marticorena that such a study was unnecessary, she also said that if one was going to be done, it should be done by someone other than Mr. Morgan, who she said was biased in favor of Mr. Marticorena. Asked to submit the resume of an alternate candidate, she said she would but never did.

35. Prior to Mr. Marticorena's request, neither Charter nor CCI had ever been asked to pay for a consultant to review its books and business plan to see if a transaction was economically viable, or even to participate in or cooperate with such a study. Such a request was inconsistent with the practice and custom in the cable industry for transfers or changes of control.

36. Under the terms of its franchise, Charter was (and remains) required to pay a five-percent franchise fee to the County, the maximum fee permitted by federal law (TX 3 at 1798). The County could have used the franchise fee paid by Charter to fund a due diligence study if it had chosen to do so.

37. These findings will return to the story of the proposed due diligence study but, to maintain events in approximate chronological order, we must now turn to the so-called first information request.

### The First Information Request (September 1)

38. On September 1, Mr. Marticorena mailed Ms. Foushee a massive information request, sometimes referred to herein and by all parties as the "first information request" (TX 8).

39. The letter was nine pages long, single spaced. It requested seventy items, including subparts. The specifics show that Mr. Marticorena spent little or no time actually reviewing the Form 394 submissions before sending the letter (TX 6) or trying to determine the applicability of the questions to the actual deal. Instead, he printed out admittedly boiler-plate information demands. For instance:

(a) The first fifteen standardized questions (TX 8 at ¶¶ 2–5) related to the impact of the transaction on future cable rates and whether plaintiffs would seek to use the acquisition costs to justify future rate increases ... Even the County concedes these were form inquiries with little or no application to the problem at hand.

(b) Many of the other questions referred to "lenders" and "credit facilities" despite the fact that the Form 394 submissions and Ms. Foushee's August 26 meeting with the County's special counsel made clear that no such loan agreements were to be employed.

40. Beyond this, the request was broad and burdensome, asking, for example, for "any and all agreements ... or any other document which exists in the hands of Charter, Paul Allen, or any related entity, or both, regarding the System or Transfer" (TX 8 at 6), *i.e.*, asking for every sliver of data on the deal. The letter stated that the LFAs were "concerned whether the Transfer, considering its totality of its economic impacts, will preclude or impede Charter from realizing a reasonable return ..." (TX 8 at 1).

### Charter's Supplemental Information

41. On September 17, 1998, Charter responded with a two-inch thick, written response with back-up documents (TX 10). These materials included financial statements, ten-year projected income statements, information on the cable systems in which Mr. Allen then owned a controlling interest, an explanation of Mr. Allen's anticipated role in the company, and information on the calculation of the acquisition price (TX 10). These materials included, among other things, (a) further assurance that no new debt would be incurred by the Charter corporate entities in order to finance the transaction, (b) information that Charter's debt would, in fact, be reduced by approximately $38 million, and (c) a reassurance that the purchase price would not and could not, under federal rate regulations, be used to justify a later increase in regulated rates. Regarding the latter, the submission stated:

Finally, as noted above, as Charter understands the applicable FCC rules, the recording of acquisition-related intangible assets for accounting purposes in connection with the pending acquisition will not have any impact whatsoever on the Form 1220 maximum permitted rate for the franchises at issue here, for the simple reason that the pending acquisition is taking place after May 1994.

(TX 10 at 1147.)

42. During the trial, plaintiffs further contended that the County should not have been concerned over rate increases because of the rate order (from the Sonic deal). During the communications at issue, however, plaintiffs never so asserted. The reason seems clear. As stated, the parties proceeded to deal with one another on a "group LFA" basis. It would have been pointless to refer the other LFAs to information solely in the files of Santa Cruz County. Nonetheless, as stated, Charter and CCI did make clear that they viewed the FCC regulations as proscribing any attempt to pass on acquisition costs in excess of the net asset value to consumers in the form of rate increases.

### Mr. Marticorena's Written Proposal for a Due Diligence Study

43. Meanwhile, on September 9, Mr. Marticorena sent to Charter a proposal for

a due diligence study by Mr. Morgan (TX 12). The study was to be performed for the group of LFAs, including Santa Cruz County. The proposal detailed categories for analysis and investigation, including inquiries into comparable industry transactions. The alleged need for the study was that Mr. Allen had proposed acquiring Charter at 14 times 1999 estimated operating cash flows. Conceding that there might have been valid business reasons for this purchase price, the proposal professed worry that it might lead to pressure on Charter to push cable rates up to justify the price paid for the company (TX 23 at 1114). The proposal would have required making ten-year financial projections with two weeks of on-site field work at CCI's St. Louis headquarters and Mr. Allen's Bellevue offices, in part to assess their "business plans," followed eventually by draft and final reports. The estimated fee was $39,000 (TX 23).

44. On September 15, Mr. Marticorena met with Ms. Foushee to discuss, among other things, the Allen transaction (as well as a separate pending cable acquisition). During the meeting, Mr. Marticorena again brought up his request for Charter to pre-fund a "due diligence study." He also provided Ms. Foushee with an additional copy of Mr. Morgan's proposal. She said she would get back to him.

### Mr. Marticorena's Follow-Up Letter (October 5)

45. By October 5, Mr. Marticorena had not heard back from Ms. Foushee on the due diligence study. On that day, therefore, Mr. Marticorena sent another letter to Charter (TX 25). It reiterated a desire for plaintiffs to pre-fund a due diligence study. The letter warned that Charter's equivocation in addressing the due diligence issue could cause delays or an adverse decision. This was a threat, in effect, to refuse to process the FCC Form 394 applications.

46. Ms. Foushee received the letter. Busy with the overall deal, she did not consider it a "priority." She did not respond to the letter until November 3. In her written reply of that date (TX 24), she asserted that, although Mr. Marticorena could request information beyond that specified in the Form 394, such requests could not toll the 120–day deadline for action on the transfer application. She further stated that, on October 1, she had faxed the resume of Louis Karrison, whom she proposed to perform any due diligence study, and complained that Mr. Marticorena had not responded to the information. Through inadvertence, Ms. Foushee had not, in fact, caused the resume of Mr. Karrison to be faxed. Plaintiffs have been unable to locate any documentation confirming that the resume was faxed. Plaintiffs failed to produce any witness to confirm that the resume was ever faxed.

### Mr. Marticorena's November 2 Correspondence

47. On November 2, Mr. Marticorena sent Charter two separate, detailed and lengthy demands. Both are centerpieces of the case. One concerned a demand for further additional information and will be described below. The other concerned the due diligence study. Mr. Marticorena mailed these information demands before receiving Ms. Foushee's November 3 letter. Ms. Foushee mailed her November 3 letter before receiving Mr. Marticorena's November 2 information demands. The letters crossed in the mail.

48. As to the due diligence study letter, Mr. Marticorena had no agreement to pre-fund a "due diligence study" as of November 2. To reframe his position, his letter demanded that Charter directly retain an "independent" financial consultant at its own cost to review and to opine on the company's business plans and the ability of Mr. Allen to "secure a reasonable return of and on its investment," and to generate a set of ten-year projection revenues and costs in a detailed prescribed format (TX 12 at 1194). The letter stated in part:

> [A]lthough even market rate acquisitions present serious issues to Franchising Authorities and subscribers regarding the potential impact of those acquisitions

upon subscriber rates, a transaction which appears to be priced at levels significantly exceeding those otherwise obtainable in the marketplace produces magnified concerns regarding how the Buyer will be able to secure a reasonable return of and on its investment in Charter [footnote omitted].

\*　　\*　　\*　　\*　　\*　　\*

In order for the Franchising Authorities to properly analyze the economic and operational viability of the Transfer, the Franchising Authorities hereby respectfully request that the Seller and the Buyer, either individually or collectively, submit a report of an independent financial consultant (the "Independent Financial Consultant"), as defined below, which shall be prepared at the sole cost and expense of the Seller and the Buyer, which discusses, analyzes, and provides an opinion as to the reasonableness and fairness of the transaction to the parties and to consumers based on the criteria set forth below.

The "independence" of the consultant was to be measured by six stated criteria. The consultant was to perform 25 specified calculations in conjunction with a ten-year projection of revenues and costs. The letter was eight pages long, single-spaced.

49. The letter further requested documents such as:

(a) Copies of any and all internal memoranda, reports, analyses, correspondence, financial projections or other documents prepared by the seller, or any agent thereof, relating to the determination, calculation, negotiation or method of determining the acquisition price.

(b) Copies of any and all internal memoranda, reports, analyses, correspondence, financial projections or other documents prepared by the buyer, or any agent thereof, relating to the determination, calculation, negotiation or method of determining the acquisition price.

(c) Copies of any reports, studies, opinions, opinion letters or other documents prepared by independent parties, including but not limited to any "fairness opinions" relating to the transfer, presented to, considered by, or available to the board of directors of the seller and buyer, or any affiliate or subsidiary thereof, concerning the economic viability of the transfer, the fairness of the transfer or which will be used, in whole or in part, as a basis for any recommendation to the owners of the seller and the buyer, or any affiliate or subsidiary thereof, concerning a proposed action or vote upon the transfer.

The letter asked for the documents to be produced within ten days (TX 12 at 8).

### The Second Information Request

50. The second November 2 letter was a further information request. It was eight pages long, single-spaced. It included 31 paragraphs of inquiry. It asked that Charter, among other things, justify the financial pro formas submitted earlier by Charter on September 17. In doing so, Charter was told to provide *"extrinsic sources"* to support its projections, to provide a discussion of Charter's business plan and approach for maintaining its subscriber base against competitors, and to develop a new set of pro formas showing projected capital expenditures and projected income tax payments over the next ten years (TX 11).

51. The first seven interrogatories of the letter were expressly grounded on supposed aggressive projections set forth in Charter's pro forma submissions served on September 17. These had allegedly been projecting growth at rates in excess of supposed industry trends. Paragraph 2 of Mr. Marticorena's letter, for example, stated that Charter's earlier submission had showed average annual increases of eight percent with respect to Expanded Basic Service Revenue (TX 11 at 2458). In fact, all now concede herein that annual increases had only been shown at 6.5 percent. Mr. Marticorena simply misread or misanalyzed the data. The same was true for

six other questions in this vein. Thus, the average growth in basic service revenue was not 10%, it was 7.4%; average annual growth in expanded basic revenue was not 8%, it was 6.5%; average annual growth in a la carte service revenue was not 240%, it was 41.4%; average annual growth in ancillary revenue was not 22%, it was 12.8; average annual growth in advertising revenue was not 26%, it was 14.7%; and average annual growth in total revenues was not 11%, it was 8%. No credible excuse was given by Mr. Marticorena for these material errors.

52. For the first time, the letter also requested evidence of the long-term commitment of existing management to stay with the venture subsequent to closing, as well as evidence that some portion of the acquisition price would inure to the benefit of the new company and subscribers by way of long-term retention of existing management (TX 11 at ¶¶ 6–7). The November 2 letter also sought clarification as to how the overall price had been allocated between Charter and the other acquired entities (TX 11 at ¶¶ 7–8).

### Charter's Decision to Cease Providing Information

53. In mid to late November 1998, Ms. Foushee and Mr. Marticorena had a telephone conversation in which Ms. Foushee stated that Charter believed the information requested in the County's two November 2, 1998, letters was unreasonable, that Charter would not be providing further responses, that Charter believed the County had sufficient information to act on the consent request, and that, while Charter was willing to schedule a meeting with the County and other franchising authorities represented by him to work through certain issues, the CCI/Allen transaction would close by year-end and Charter could and would not agree to extend the 120–day review period.

54. On December 1, 1998, Charter sent Mr. Marticorena two letters declining to go forward with any "due diligence study" (TX 26) and declining to provide the additional requested information (TX 13). In her letter on the information requests, she said (TX 13):

> Secondly, as we have indicated, both orally and in writing, the projections that have been provided to you are the projections which Charter had prepared prior to the Allen acquisition. The Allen acquisition will have no effect on the projected income, and only a positive effect on the debt and debt levels. To repeat, there will be no increase in debt levels in this transaction. Allen is simply purchasing all outstanding equity. No additional debt is being added to any franchise, indeed, because of Mr. Allen's favorable economic condition, all existing debt can be refinanced at more favorable rates. What this means, as you "analyze" the transaction is that in order to question the viability of Charter post-Allen, you must question the viability of Charter pre-Allen, a proposition which is ludicrous at best and totally unsustainable on any legal or factual grounds.

With respect to the interrogatories that had been premised on faulty homework by Mr. Marticorena, she said (TX 13):

> Third, your questions suggest that you have already reached conclusion that Charter would have to accept in order to respond. We do not accept your blanket assertions, for instance, that revenues will increase at an annual average rate of ten percent (10%). Because we cannot accept your conclusions, we can form no meaningful response. Likewise, your inquiry into the disposition of the proceeds of closing is not relevant to your disposition of our submission.

55. In her separate letter of the same date (TX 26), Ms. Foushee explained why there was no need for a due diligence study:

> Further, that portion of your footnote which ends on Page 4 strongly suggests that the concern is with increased debt used to finance these transactions. The footnote further suggests that rate increases are needed to service the debt. It is convenient for you to dismiss, but

the fact of the matter is that there is no new debt involved in this transaction. The absence of debt renders your basic premise faulty and just plain wrong. For these reasons, Charter is unwilling to fund a Study to determine that the debt levels can be sustained because there is no new debt to the franchise operating entities in this transaction.

The Study, likewise, is unnecessary because the financial plan that Allen/Charter presented in the pro formas provided to you is basically the same financial plan employed prior to the acquisition. I use the term basically, because one effect of the Allen acquisition is to give Charter more favorable borrowing terms. Additionally, some preferred equity will be paid out. As stated in previous correspondence and communications, the acquisition is an assumption of current debt and an infusion of equity. When Charter has used debt to finance an acquisition in the past, you have complained that there is not enough equity. Here we have a transaction totally funded with equity and you make the same complaint. The two positions cannot be reconciled. I am unaware of a company being able to possess too high an equity ratio. But this is exactly what your arguments and your inquiry would suggest.

56. This was the first time that a reference was made to the projections given to Mr. Marticorena before the CCI/Allen transaction. The point made in Ms. Foushee's letters was that the company projections now being criticized were the same as the projections provided to Mr. Marticorena and found adequate before the CCI/Allen deal, *i.e.*, in the Charter/Sonic transaction. At trial, Mr. Marticorena tried to discredit Ms. Foushee on this point but wound up, in the Court's view, discrediting only himself. Mr. Marticorena testified that, after receiving the letters, he looked to see if the CCI/Allen projections were, in fact, similar to those previously submitted in the Sonic transfer a few months earlier, as suggested by Ms. Foushee's letter. He found, he said, that

they were materially different. Taken at face value, this undermined Ms. Foushee. On closer questioning, however, Mr. Marticorena stated that the projections he compared were merely at the *local* Santa Cruz level rather than at the combined *company-wide* level. Specifically, he claimed to have compared the one-page multi-year income projection for the Allen transaction (TX 56) with the one-page multi-year income projection for the Sonic projection (TX 58), *both limited to a Santa Cruz allocation only*. These do differ somewhat (but only because of the method, noted on each, used to allocate line items from the combined numbers).

57. Ms. Foushee was, however, correct after all. Mr. Marticorena himself had originally raised the projection issue *at the combined company level*, not at the local level. Specifically, Mr. Marticorena's own November 2 letter had listed "Questions Relating to Document Entitled 'Charter Communications Properties LLC Projected Income Statement' dated September 14, 1998" (TX 11). This undisputedly had been a reference to a spreadsheet bearing that exact title and date, prepared as a combined company-wide projection (TX 57). In turn, Charter's December 1 letter (TX 26) had responded at the combined company-wide level, stating that the projections were the same as those previously provided.

58. Having now seen the spreadsheets, the Court is certain that Ms. Foushee was correct that at the *combined company-wide* level, the projections were the same, that there was no inconsistency between them, and that Mr. Marticorena had had both had sets of identical projections all along (TX 57 and TX 60). Not only was Ms. Foushee correct on this point but it is disappointing that Mr. Marticorena resorted to a phony comparison to try to evade this fact.

### The Denial Resolution

59. Mr. Marticorena and Mr. Busch decided then to recommend a denial of the request for approval of change in control.

On December 4, 1998, Mr. Busch personally sent a fax to Ms. Foushee in St. Louis. The fax stated that a resolution denying the change in control would come before the board of supervisors on December 8. As at least Mr. Marticorena knew, however, Ms. Foushee was on vacation in Australia. Mr. Marticorena knew that Ms. Celeste Vossmeyer, a vice president of Charter, was supposed to be covering for Ms. Foushee. The fax, however, was not sent to Ms. Vossmeyer. It was sent to Ms. Foushee's attention. Although Mr. Busch testified that he faxed a copy of the staff report and proposed denial resolution to Ms. Foushee on December 4, 1998, the fax transmittal report indicates it was not sent to Charter until after the close of business on Friday, December 4 in St. Louis (Court Exh. 1). Mr. Busch never tried to notify anyone else at Charter.

60. On December 8, 1998, Charter's proposed transfer application came before the County board of supervisors. The board adopted a resolution denying plaintiffs' application "without prejudice." No representatives of Charter were present at the December 8 meeting of the County's board of supervisors or had actual knowledge of the meeting. The action was part of the board of supervisors' consent calendar. The information presented to the board for its consideration was slanted heavily against Charter and Mr. Allen, neither of whom had fair and reasonable notice of the proceeding or opportunity to present their side of the issue.

61. The denial resolution based its action on the supposed fear of an excessive purchase price and the alleged failure of the applicants to cooperate in providing information (TX 15). A whereas clause recited that the "County requested certain information ... relating to ... the financial ability of the Buyer to generate sufficient cash flow to meet debt and obligations, satisfy capital expenditure obligations, and provide a reasonable return of and on its investment." The same recital referred to and incorporated by reference the same November 2 letter quoted above concerning the due diligence study demanding that Charter supply a due diligence study "at the sole cost and expense of the Seller and the Buyer," which letter was appended physically to the resolution. The next recital then stated that the applicants had "unreasonably delayed or refused or failed to provide a material portion of the requested additional information." Following the recitals, the action resolved specifically that the applicants had failed or refused to cooperate with "County Staff, Special Counsel and outside consultants retained by the County in undertaking the due diligence investigation of the Transfer." Presumably the "outside consultant" was Mr. Morgan. It further resolved that the applicant had failed to supply all necessary information requested by the County and had "failed to provide any independent corroboration or justification for its income projections." The resolution was permeated with references to rate of return and the financial projections.

### The Clift Hotel Meeting

62. When Ms. Vossmeyer, Charter's vice president of government and community relations, learned of the County's denial, she contacted Mr. Richard Patch, an attorney in San Francisco (and trial counsel herein), to see if he could set up a meeting with the County. Mr. Patch had had a professional but adversarial relationship with the County and Mr. Marticorena going back to the 1980's, and was already engaged in a mediation with the County regarding a different dispute. Mr. Patch asked Mr. Marticorena to solicit the board of supervisors as to what would satisfy the concerns of the County regarding the CCI/Allen transfer assuming Charter would not provide any of the information requested by the County on November 2, 1998. Mr. Patch made his request so that Charter might receive the County's consent and close the transaction prior to year's end and thereby avoid any problem of the $100 million penalty. When he spoke with Mr. Marticorena, Mr. Patch indicated that (a) Charter was abso-

lutely firm in its decision not to provide additional information or further justify the economic viability of the CCI/Allen transaction; (b) Charter would close the transaction before the end of the year; and (c) a failure of the parties to reach a mutually-acceptable resolution of the matter would result in a "big fight." Mr. Patch asked what conditions could be imposed upon the transaction to allow the County to give its consent.

63. Mr. Marticorena indicated to Mr. Patch that he had not been authorized by the board of supervisors to enter into negotiations. Approval by the board prior to year's end was unlikely, he said, given the fact·that the board only met one more time, on December 15, before year's end. Mr. Patch asked Mr. Marticorena to attempt to get delegated authority from the board at its December 15 meeting, so that the parties could engage in meaningful discussions and, if mutual agreement could be obtained, County approval could be provided prior to the closing of the transaction. Mr. Marticorena agreed to try.

64. Mr. Marticorena then discussed the matter with the board, and on December 15, 1998, received in conjunction with the county administrative office board authorization to approve a transfer agreement, subject to ratification at the first meeting of the board in January 1999 (TX 16). They were authorized by the board to negotiate an approval if Charter would agree to a further freeze and paid the County $500,000 (TX 16). The Board's authorization stated the requirements as follows:

> 1. Extend the freeze period for the rate upon completion of the rebuild to two years and improve the indexing method for rate increases.
>
> 2. Provide the County with a mitigation payment equal to approximately 5% of the difference between the per subscriber purchase price of Sonic and the sale price to Paul Allen multiplied times the number of subscribers.

65. The combatants met on December 17 at the Clift Hotel in San Francisco.

Mr. Busch provided Charter with a copy of the board's conditions for approval (TX 16), and stated that the County would give its consent to the change of control prior to the close of the CCI/Allen transaction only if Charter agreed to a further rate freeze, agreed to improve the indexing method for future rate increases, and agreed to·make a payment to the County of approximately $500,000. Plaintiffs were told that the County's proposal was essentially a take-it-or-leave-it proposition if they wanted consent prior to the close of the transaction. Plaintiffs refused these conditions.

66. Contrary to the County's contention, there was no verbal agreement that the discussion was "confidential" or "off the record." Mr. Marticorena had normally been expert in well documenting such agreements in the past. There was, however, no such documentation on this occasion. Nor had Mr. Marticorena's or Mr. Busch's written submission to the board referred to any confidential or off-the-record status of the proposal (TX 16).

67. On December 23, 1998, the acquisition closed without the County's approval. Of the more than 470 local franchising authorities whose consent to the ultimate change of control that would result from the transaction was requested, only four (including the County and three other communities also represented by Mr. Marticorena) refused to give their consent by the December 23, 1998, closing date.

68. On March 9, 1999, the County issued a preliminary notice that the franchisee had violated the franchise agreement by closing without the County's consent. The notice threatened to terminate or revoke the franchise agreement and/or seek liquidated damages (TX 17). Plaintiffs then commenced this action.

## ANALYSIS AND CONCLUSIONS OF LAW

■ The ultimate question is whether the refusal by Santa Cruz County to consent to Paul Allen's acquisition of the outstanding shares of Charter Communica-

tions, Inc. ("CCI") was reasonable and lawful. The franchise agreement incorporated the terms of the local cable ordinance under which the County's consent was required for the transfer but could not be "unreasonably withheld."[2] The denial was based upon plaintiffs' refusal to comply with the County's information requests, its demand for an independent financial study to be financed by Charter, its demand for cash payment of $500,000 and its demand for a further rate freeze. Whether consent was "unreasonably withheld" turns upon whether those demands were reasonable. Information requests that exceeded the County's authority to request information under Section 617 of the Cable Act and the FCC regulations promulgated thereunder would not have been reasonable. The same is true of information requests that violated plaintiffs' First Amendment rights. To deny consent based on plaintiffs' failure to provide any such information would, in turn, be unreasonable. And, to deny consent merely for refusing to pay unlawful fees or for refusing to acquiesce in an unlawful rate freeze would be unreasonable. The parties sharply disagree on the law governing each of these considerations.

**2.** Section 3(C)(1) of the franchise agreement provides:

> The provisions of the Ordinance are incorporated herein by reference as if set out in full, and form part of the terms and conditions of this Agreement. In the event of any conflict or inconsistency between the terms and conditions of this Agreement and the provisions of the Ordinance, this Agreement shall prevail.

(TX 3 at 1797).

The cable ordinance provides, in relevant part (TX 2 at 900):

> M. Nontransferable. The franchise shall not be sublet or assigned, nor shall any of the rights or privileges therein granted or authorized be leased, assigned, sold or transferred, either in whole or in part, nor shall title thereto, either legal or equitable, or any right, interest or property therein, pass to or vest in any person, except the grantee, either by act of the grantee or by operation of law, without the prior written consent of the grantor, *which consent shall not be unreasonable withheld.* The granting of consent shall not render unnecessary any

## The FCC 120–Day Rule

■ With respect to the FCC's 120–day regulation, the Court concludes, for the reasons set out at length hereinafter, that the FCC's 120–day rule is purely procedural. All substantive limits on the power of local franchising authorities to regulate cable transfers must flow from the First Amendment, other federal law, or local law or agreement. As to the procedural aspects, however, the rule must be construed to impose certain outer limits on LFAs' power to request information over and above that required by Form 394 implementing the rule. Because this is an issue of first impression, this order will set forth the reasons in detail.

Section 617 of the Cable Television Consumer Protection and Competition Act of 1992, 47 U.S.C. 537, established a 120–day timeline for local franchising authorities to act on requests for approval of "transfers" of cable franchises:

> A franchising authority shall, if the franchise requires franchising authority approval of a sale or transfer, have 120 days to act upon any request for approv-

> subsequent consent. *The grantor shall promptly request and the grantee shall furnish such information as the grantor reasonably requests in connection with such transfer.* Failure of the grantor to act within sixty days of receipt of such requested information shall be deemed the consent of the grantor thereto.
>
> N. Change in Control.
>
> 1. The grantee shall promptly notify the grantor of any proposed change in control of the grantee. *Such change in control shall make the franchise null and void unless and until the grantor shall have consented thereto subject to the provisions of paragraphs 2 and 3 of this subsection, which consent shall not be unreasonably withheld. The grantor shall promptly request and the grantee shall furnish such information as the grantor reasonably requests in connection with such change of control.* Failure of the grantor to act within sixty days of receipt of such information shall be deemed the consent of the grantor thereto.

Code of the County of Santa Cruz 5.24.030(M)-(N)(1) (emphasis added).

al of such sale or transfer that contains or is accompanied by such information as is required in accordance with Commission regulations and by the franchising authority. If the franchising authority fails to render a final decision on the request within 120 days, such request shall be deemed granted unless the requesting party and the franchising authority agree to an extension of time.

Pursuant to this rulemaking authority, the FCC held rulemaking proceedings and promulgated the following rule in 1993, a rule whose interpretation is one of the core issues in this case:

(a) A franchise authority shall have 120 days from the date of submission of a completed FCC Form 394, together with all exhibits, and any additional information required by the terms of the franchise agreement or applicable state or local law to act upon an application to sell, assign, or otherwise transfer controlling ownership of a cable system.

(b) A franchise authority that questions the accuracy of the information provided under paragraph (a) must notify the cable operator within 30 days of the filing of such information, or such information shall be deemed accepted, unless the cable operator has failed to provide any additional information reasonably requested by the franchise authority within 10 days of such request.

(c) If the franchise authority fails to act upon such transfer request within 120 days, such request shall be deemed granted unless the franchise authority and the requesting party otherwise agree to an extension of time.

58 Fed.Reg. 42019 (Aug. 6, 1993); 58 Fed. Reg. 45064 (Aug. 26, 1993). The rule remains codified at 47 C.F.R. 76.502 (1999).

When the FCC issued the rule, it also issued a preamble explaining it. The preamble set forth the competing arguments of the industry versus the local franchising authorities concerning the desire of LFAs to seek information before giving approvals:

82. *Comments.* Most cable commenters request that the Commission establish uniform rules regarding the information required to commence the 120–day review period, and clarify that the 120–day period is not tolled by additional information requests, not otherwise required by Commission rules, the franchise, or applicable local law. Cable commenters argue that such a limitation is necessary to ensure the efficacy of the 120–day statutory limitation. Cable commenters argue that such information requirements should be limited to information necessary to establish the legal, technical and financial qualifications of the proposed transferee. Cable commenters also suggest that the Commission limit the ability of franchise authorities to request additional information, beyond the information required by Commission rules, the terms of the franchise, or applicable local law.

83. In contrast, franchise authorities argue that the FCC should confirm that local franchise authorities have broad authority to request all information necessary to determine whether a transfer is in the public interest. According to local authorities, the Commission's statutory mandate is to develop regulations to ensure that the franchise authority receives all information necessary to *"begin"* an evaluation of a transfer request. As a consequence, franchise authorities insist that they should not be limited in the types of information they can request. Finally, franchise authorities argue that the 120–day period should begin to run only after the franchise authority notifies the cable operator that it has received all information necessary to evaluate the proposed transfer.

*In the Matter of Implementation of Sections 11 and 13 of the Cable Television Consumer Protection & Competition Act of 1992,* FCC Report & Order at ¶¶ 82–83, FCC 93–332, MM Docket No. 92–264 (1993).[3]

---

**3.** A synopsis of this document may be found at 60 Fed.Reg. 37830 (July 24, 1995).

The FCC balanced these competing concerns in light of congressional intent. The FCC held that the 120 days should begin as soon as the *required* information is submitted. The FCC rejected the argument that the 120–day period should commence only after all *supplemental* information is submitted:

> 85. The informational requirements we adopt in response to this provision are limited to the information necessary to establish the legal, technical and financial qualifications of the proposed transferee and any information required by the franchise or applicable local law. In developing these informational requirements, we looked to the information required by the Commission in connection with transfer requests for broadcast licenses and CARS authorization [footnote omitted]. In this regard, the Commission has developed a standardized form to be used in connection with transfer requests ... A copy of the FCC cable transfer form is attached as Appendix B to this *Report and Order/Further Notice.*
>
> 86. In addition to the information specifically solicited by the FCC Form, franchise authorities are permitted to request such additional information as is reasonably necessary to determine the qualifications of the proposed transferee. However, such requests for additional information, beyond the requirements of the franchise agreement or local law, will not toll or extend the 120–day period unless the cable operator and franchise authority otherwise agree to an extension of time as provided under the statute. Cable operators are required, however, to promptly respond to such requests by completely and accurately submitting all information reasonably requested by the franchise authority. We conclude that use of the Commission's standardized form in connection with the 120–day limitation will ensure that franchise authorities are provided with sufficient information to evaluate and render prompt decisions with respect to such transfer requests.

*Id.* at ¶¶ 85–86.

Footnote 38 of the FCC preamble warned LFAs against trying to delay a transfer or to impose conditions that would impinge on the FCC's statutory authority over rate regulation:

> Section 617 does not require the Commission to adopt substantive standards governing the approval of transfers. It should be emphasized, however, that in exercising their transfer jurisdiction, franchising authorities may not seek to circumvent the Commission's authority over rate regulation, franchise fees or other matters. For example, a franchising authority may not delay a transfer or impose conditions on a transfer authorization that would impinge upon the Commission's statutory authority.

*Id.* at ¶ 39 n. 38.

FCC Form 394 was appended to and promulgated with the new rules. Form 394 was prescribed for obtaining LFA approval for a transfer of a franchise. The instructions thereon stated in part:

> As required by Section 617(e) of the 1992 Cable Act, the franchise authority shall have 120 days from the date of filing of this form, complete with all exhibits and any information required by the franchise agreement or applicable state or local law, to act upon such request. If the franchise authority fails to render a final decision on such request within 120 days, such request shall be deemed granted unless the requesting party and the franchise authority agree to an extension of time.
>
> \*　\*　\*　\*　\*　\*
>
> In addition to the information requested on this form, cable operators are required to submit all information required by the cable franchise agreement or applicable local law or that the franchising authority deems necessary or appropriate in connection with the transfer determination. Requests for such addi-

tional information by the franchise authority shall not toll the 120–day limit on franchise authority consideration of transfer requests.

Part I of the form required a copy of the transfer agreement but stated that "Confidential ... pricing or marketing information ... may be redacted." Part II concerned the Transferee/Assignee. Section II thereof set forth questions concerning "legal" qualification. Section III set forth two questions concerning "Financial Qualifications," quoted exactly as follows:

> (a) The transferee/assignee certifies that it has sufficient net liquid assets on hand or available from committed resources to consummate the transaction and operate the facilities for three months.
>
> Yes _____ No _____
>
> (b) Attach as an exhibit the most recent financial statements, prepared in accordance with generally accepted accounting principles, including a balance sheet and income statement for at least one full year, for the transferee/assignee or parent entity that has been prepared in the ordinary course of business, if any such financial statements are routinely prepared. Such statements, if not otherwise publicly available, may be marked CONFIDENTIAL and will be maintained as confidential by the franchise authority and its agents.

Note well that the form required information about projected financial strength only as far out as one year and, as to liquid assets, only three months out. Section IV had a single question concerning "Technical Qualifications":

> Set forth on an Exhibit a narrative account of the transferee's/assignee's technical qualifications, experience and expertise regarding cable television systems, including, but not limited to, summary information about appropriate management personnel that will be involved in the System's management and operations. The transferee/assignee may, but need not, list a representative

sample of cable systems currently or formerly owned or operated.

In response to the 1992 rule, various LFAs promptly petitioned for reconsideration, eventually leading to a 1995 FCC order reaffirming the 1992 order. On reconsideration, the LFAs argued that:

> Section 617 of the Communications Act contains no limit on the information a franchising authority may require a cable operator to submit in connection with a request for approval of a sale or transfer, and challenges the propriety of the Commission's implementation of rules that limit the amount and type of information the local franchise authority may obtain from the cable operator to information specifically required by FCC Form 394, the terms of the franchise agreement or applicable state or local law [footnote omitted].

*In the Matter of Implementation of Sections 11 and 13 of the Cable Television Consumer Protection & Competition Act of 1992, FCC Memorandum Opinion & Order on Reconsideration of the First Report & Order* at ¶ 47, FCC 95–21, MM Docket 92–264 (1995).

The LFAs further argued (¶ 48):

> [T]he 120–day period should not begin to run until all information requested by the local franchise authority has been submitted and the local franchise authority so notifies the cable operator. The current rule ... inappropriately limits the duration of local franchising authorities' power to disapprove cable system transfers [footnote omitted].

In this connection, the LFAs relied on the House Report leading up to the 1992 Act. This report is central to defendant's arguments herein and the relevant paragraphs deserve full quotation (with key passages in italics):

> Subsection (e) limits the duration of time a franchising authority has to disapprove a transfer. After the initial 36–month period following the sale or transfer of ownership of a cable system, if the

franchise requires franchising authority approval of a sale or transfer, a franchising authority has 120 days to act upon any request for approval of such sale or transfer that contains or is accompanied by such information as is required in accordance with Commission regulations. If the franchising authority fails to render a final decision on the request within 120 days, the request shall be deemed granted, unless the requesting party and the franchising authority agree to an extension of time.

The Committee intends that the 120–day limitation on franchise approval of a sale or transfer required under subsection (e) shall not commence until the cable operator has provided the franchising authority all information required under the Commission's regulations. The time limit may be extended by mutual agreement of the franchising authority and any party requesting approval of the sale or transfer.

The Committee intends that the FCC regulations will be designed to ensure that every franchising authority receives the information required to begin an evaluation of a request for approval of a sale or transfer. *Such information may include detailed financial information showing the effect of the transfer or sale on rates and services; the contracts and agreements underlying the sale or transfer; information concerning the legal, financial and technical qualifications of the transferee; and information concerning the transferee's plans for expanding (or eliminating) services to subscribers. The amendment is not intended to limit, or give the FCC authority to limit, local authority to require in franchises that cable operators provide additional information or guarantees with respect to a cable sale or transfer. The subsection also is not intended to limit, or give the FCC authority to limit, a franchising authority's right to grant or deny a request for approval of*

*a sale or transfer, in its discretion, consistent with the franchise and applicable law.*

House Rep. No. 102–628, 102d Cong., 2d Sess., 120–21 (1992) (emphasis added).

Plaintiffs dismiss the House Report as having been superseded and rendered inoperative by a conference report. This argument is without merit. Section 617 derived from the House. The Senate bill had no analogue to the final enactment. The final version of Section 617 was virtually identical to the House bill described in the House Report. Plaintiffs' repeated contention that the House Report is somehow not proper legislative history is mystifying. Indeed, the FCC itself twice cited the House Report.[4] It is a separate question, however, whether the House Report can carry the weight assigned by the County, as will be shown.

In its order on reconsideration, the FCC acknowledged that Congress intended LFAs to be able to seek additional information but declined to change the rule. Significantly, the FCC did not address any *substantive* ground that LFAs might invoke to deny requests; nor did it address the phrase (in the House Report) concerning solicitation of information on "the effect of the transfer or sale on rates and services." The main issue addressed by the FCC concerned the 120–day procedural limit (the NATOA referenced below was a trade association of LFAs):

50. *Discussion.* \* \* \* Our implementing rules provide for commencement of the 120–day period when the cable operator has submitted a completed FCC Form 394 and any additional information required by the terms of the franchise agreement or applicable state or local law [footnote omitted]. We concluded in the *First Report & Order* that local franchise authorities are permitted to request additional information they deem reasonably necessary to determine the

---

4. The FCC footnoted the House Report twice (at its notes 108 and 109). At no time did the FCC order indicate that the House Report

had been rendered inoperative by a subsequent conference report.

qualifications of the proposed assignee or transferee, but that requests for information not explicitly required by the franchise agreement or local law will not toll the statutory 120–day limitation unless the franchise authority and the cable operator agree to an extension of time [footnote omitted]. The rationale underlying this rule is to provide cable operators some degree of assurance and certainty that local franchise authorities will act promptly and not unduly delay consummation of proposed transactions. We affirm the rule we adopted in the *First Report & Order* and, accordingly, deny NATOA's request that the 120–day period not commence until the cable operator is affirmatively advised that the franchise authority has received all information it seeks.

The FCC rejected the LFAs' contention that they had unlimited scope of inquiry on transfers:

51. Section 617(e) provides that when a local franchise agreement grants the local franchise authority the right to review sales or transfers of cable systems held for three or more years, the franchise authority shall have 120 days to act upon any such request that contains the information required by Commission regulation or by the franchise authority [footnote omitted]. We have interpreted this language as a limitation on the information a cable operator must provide to trigger the 120–day time period. While this language arguably could be interpreted to allow unlimited requests for information by the franchise authority, we do not believe that such an interpretation comports with the intent of Congress.

 The FCC then reaffirmed two fixed but competing principles – the finality of the 120–day deadline and the duty of applicants to answer LFA information requests over and above the Form 394 data:

52. In enacting Section 617(e), Congress imposed a 120–day approval period on the sale or transfer of cable systems held for three or more years

because Congress wanted to ensure that the local franchise approval process not unduly delay the consummation of transactions that do not implicate the concerns underlying the anti-trafficking provision. The language of the statute and the legislative history reflect Congress' expectation that the Commission establish regulations designed to ensure that franchising authorities that possess the right to review transfer requests receive the information required to begin an evaluation of a request for approval of a sale or transfer of such a cable system [footnote omitted]. Accordingly, we created FCC Form 394 with the expectation that the information required by the form would establish the legal, technical, and financial qualifications of the proposed transferee or assignee. The legislative history also clearly establishes that Congress intended to allow local franchise authorities to request information that is required by the franchise agreement, in addition to that required by Commission regulation [footnote omitted]. Consequently, we adopted rules requiring a cable operator seeking local franchise authority approval of a proposed transfer to submit any additional information provided by the terms of the franchise agreement. The rules we adopted provide that the franchise authority shall have 120 days from the submission of a completed FCC Form 394 and any additional information required by the terms of the franchise agreement or applicable state or local law, to act upon the waiver request [footnote omitted]. Thus, the cable operator is on notice that information requirements may exist in three locations and that the submission of all such information is necessary for the franchise authority to be bound by the 120–day time period. To the extent the local franchise authority seeks additional information, as we

stated in the *First Report & Order*, cable operators are required to respond promptly by completely and accurately submitting all information reasonably requested by the franchise authority [footnote omitted].

In the end, the FCC stood by its prior order and re-affirmed the 120–day regulation without change. It is worth stating the obvious – Section 617 and the 120–day rule were intended to require LFAs to act on the merits of applications by the 120–day deadline or else the application would be deemed granted. The 120–day clock was meant to start as soon as a "complete" Form 394 is submitted to the LFA. The information-gathering process was designed to permit a reasonably-informed but not necessarily a perfectly-informed judgment on the merits. With these guiding objectives in mind, this order turns to the specific questions of interpretation of the rule.

\* \* \* \* \* \*

■ *First*, although Section 76.502(b) of the regulation is not clearly worded, the Court interprets it to mean that any LFA objection concerning the "accuracy" of any Form 394 information (or information required by the franchise agreement or by state or local law) must be affirmatively asserted within thirty days of the filing of the Form 394. If the cable operator then fails, as to the timely objections, to provide any information reasonably requested within ten days of any such request, then all asserted objections to the "accuracy" of the specifically-questioned information survive the thirty-day deadline. Specific factual information whose accuracy is not questioned in this manner within the first thirty days, however, is deemed accepted as accurate even if other points are timely questioned. Once a discrete issue becomes closed in this fashion, it must be deemed unreasonable for an LFA to attempt to resurrect it later on through supplemental information requests. Accepted as accurate does not mean approved on the merits. Negative (but accurate) information in an application, for example, may ultimately warrant rejection.

■ *Second*, subsection (b) addresses "accuracy." Does it also comprehend "completeness," *i.e.*, must LFAs also object to the completeness of a Form 394 submission within thirty days? Although the language could be clearer, this order concludes that "accuracy" includes "completeness" for purposes of the rule. A major point of the "deemed accepted" mechanism of the rule was to start the 120–day clock upon "completeness" (see subsection (a)). To eliminate doubt as to when the clock begins, the rule ought to be construed to require LFAs to object within thirty days to the *completeness* or *accuracy* of the original submission. If an LFA does not do so as to any given item, such as, for example, the applicant's legal qualification to operate a cable system, then the LFA may not re-open that subject with supplemental questions later on. A failure to timely object to completeness means that all parties are on notice that the 120–day clock is ticking.

■ *Third*, when an objection is timely made and the operator supplies *supplemental* data, is there a deadline for the LFA to object to its accuracy or completeness of the *supplement* and, apart from objections, is there a deadline for making a request for more information? The rule does not expressly cover these practical questions. Subsection (b) addresses only questions directed to the initial submission (*i.e.*, "the information provided under paragraph (a)"). If an objection is timely made to the completeness or accuracy of part of the original submission, then it logically follows that, as to that point of inquiry, the LFA may continue to press, even after a supplemental response, for a complete and accurate answer. Similarly, there is no prescribed deadline for making supplemental information requests. Although the rule sets no limit or deadline, however, a rule of reason can and should be inferred from the FCC's 1995 order that "cable operators are required to respond promptly by completely and accurately submitting all information reasonably requested by

the franchise authority" (¶ 52). The whole point of the statute and the rule is to expedite approvals (or denials) and to do so within 120 days. Interrogation that would interfere with the timely accomplishment of that goal should be viewed with suspicion. It would be unreasonable, for example, for an LFA to wait until the 119th day to request voluminous follow-up on a supplement provided, say, on the 45th day. In paragraph 51 of the 1995 order (quoted above), the FCC rejected the notion that Section 617(e) authorized "unlimited requests for information." Therefore, although the rule does not address this point explicitly, the Court concludes that the "reasonably requested" concept implies a rule of reason for supplemental information requests, both as to timing and scope.

■ *Fourth*, if an LFA makes certain information requests that are reasonable and others that are unreasonable in the circumstances, what should be the effect? The rule addresses this point only indirectly – in order to receive the benefit of the "deemed accepted" provision of subsection (b), the operator must supply "any additional information requests reasonably requested by the franchise authority." The Court understands this to mean that an operator may spurn an unreasonable request and still receive the benefit of the 120–day limit. Otherwise, however, the operator must adequately respond. But if an LFA buries its otherwise reasonable requests among a plethora of unreasonable requests, such that it is too burdensome to sort the good from the bad, the LFA offends the rule of reason. In that case, all of the commingled requests should be deemed inoperable, the LFA having engaged in a procedure for soliciting information that is unreasonable.

*Fifth*, does the 120–day provision impose any *substantive* limits on potential denials of transfer by LFAs? Plaintiffs urge that the FCC 120–day regulation confines all LFAs' inquiries to the three issues of legal, technical and financial qualification, and/or to information required by local law or agreement. This argument lacks merit.

The regulation does not so state and paragraph 52 of the FCC 1995 order (last sentence) rejected any such · limitation. And, the FCC recognized in Footnote 37 of its 1993 order that Section 617 does not involve "substantive standards governing the approval of transfers" in contrast to other statutory provisions that did grant FCC substantive authority, such as over rate regulation (as of 1993). Moreover, Section 617 itself makes no mention of substantive criteria; it speaks only in terms of a 120–day clock. In this regard, the House Report is plain spoken: Section 617 "is not intended to limit, or give the FCC authority to limit, a franchising authority's right to grant or deny a request for approval of a sale or transfer, in its discretion, consistent with the franchise and applicable law." House Rep. No. 102–628 at 120–21 (1992). The report further states that the LFA may request "detailed financial information showing the effect of the transfer or sale on rates and services ..." (*ibid.*). Although this power to request information must be subject to the rule of reason, it presupposes that, in appropriate cases, an LFA might lawfully deny a transfer because of an adverse impact on rates and/or services. As a result, this order concludes Section 617 and the 120–day regulations issued thereunder are purely procedural. Any substantive limits on LFAs' power to regulate transfers must come from other sources, namely the First Amendment, other federal statute or local law or agreement.

■ Finally, if an LFA imposes unreasonable information demands, it may not then deny the application on the ground that the applicant refuses to answer them. The rule is clear (in subsection (c)) that no extension of the 120 days is allowed without the mutual consent of both sides. The rule requires a decision *on the merits* by the LFA before the 120–day clock expires. An LFA may deny an application on the merits on any lawful ground but to deny an application on the procedural ground of spurning an unreasonable information de-

mand would eviscerate the rule and Section 617. In such circumstances, an application must be "deemed granted" under Section 617 and the rule.

### The Procedural Force of the 120–Day Rule and Its Application Herein

This order now turns to the impact of the 120–day rule herein. A preliminary point, however, must be made. Charter has vigorously argued that the County already had in its possession all of the submissions for the previous Sonic transaction and that many of the information requests for the Allen transaction had already been answered in the Sonic materials. This was true in at least some instances. But the argument lacks any serious force and the Court rejects it. As to the Allen transaction, the information requests and the responses thereto proceeded on "a group basis." Mr. Marticorena made the requests on behalf of six LFAs. With the exception of Santa Cruz County, none of the LFAs had the Sonic information. Ms. Foushee responded in kind, *i.e.*, on a "group basis." Charter did not point out that the information requested was already contained in the Sonic materials provided to one of the LFAs before. Nor did it ask to carve Santa Cruz out of the pack and treat it individually. The County could not reasonably have been expected to rummage through its prior Sonic files to find any pages corresponding to its points of inquiry. Plaintiffs' "already had the information" argument must be rejected. For different reasons, however, this order sustains plaintiffs' procedural arguments under the 120–day regulation.

\* \* \* \* \* \*

The Form 394 was filed on August 18, 1998. The September 1 information request (TX 8) was made within thirty days and was therefore timely. No objection, however, as to "completeness" or "accuracy" was made, so the 120–day clock started on August 18. It expired on December 16. The September 1 information request – the only one within the thirty-day window – dealt with future impact on rates and details of the economics of the deal.

No issue was raised regarding the legal or technical qualifications of Charter or Mr. Allen. While a question was raised concerning what role Mr. Allen would have in the ongoing operation of Charter, that could not fairly be said to implicate Charter's technical qualification to operate a cable system or whether top or mid-level management would remain. Accordingly, issues concerning the technical and legal qualifications of the applicants, after change of control, were foreclosed to subsequent inquiry by the failure to flag the issues within the thirty-day window. The application might have been denied, of course, on substantive grounds revealed in the application but not on the ground that follow-up information was not provided on those subjects. This is a significant conclusion because, after it was too late, Mr. Marticorena did try to resurrect one such issue, as shall be shown.

With respect to financial qualifications, the September 1 information request did not object to the completeness or accuracy of the data provided. Although it did pose numerous questions concerning potential future rate increases and the economic wisdom of the acquisition, those questions did not involve financial qualification. In fact, it seems clear that Charter and Mr. Allen were financially qualified and that no one has ever doubted it. The County's issue has, rather, been whether, rich though Charter and Mr. Allen may have been and remain, the economics of the deal posed risks of financial pressure eventually to increase rates or to decrease service. As such, the September 1 letter was not an "objection" to the original submission but as the parties have jointly stipulated, a supplemental "information request" (Stipulated Fact No. 28).

 The first issue under the 120–day rule, then, is whether the September 1 additional information request was reasonable such that a failure to answer it would have supported a disapproval. In determining reasonableness, the test should not be whether the trier of fact would have

asked the questions. Rather, the issue is whether any LFA in the circumstances could reasonably have propounded them.

Granting wide berth to the County, this order nonetheless finds that the set of seventy questions was unreasonable. The letter was mostly boiler-plate questions having little or nothing to do with the actual transaction. Mr. Marticorena simply lifted them from his standardized word-processing exemplars and sent them on. Similarly, a large number of other questions related to the "loan" being used to finance the deal. There was, however, no loan. Mr. Marticorena knew that Mr. Allen was paying cash. Mr. Allen had already represented that he was not going to finance the acquisition through debt. In fact, he was immediately going to pay down Charter's existing debt. The balance of the inquiry was further massive and sweeping. It was unfocused on any specific issue and was directed indiscriminately at everything. One question, to take only one example, literally asked the parties to produce for inspection "[a]ny and all ... documents ... in the hands of Charter, Paul Allen, or any related entity ... regarding the System or Transfer" (TX 8 at 6). This called for the entire universe of every scrap of paper on the deal. In short, the September 1 information request was so unreasonable in scope that it should have been deemed ineffective under the FCC rule to require a response. To its credit, however, Charter selectively responded to the letter with a thick submission on September 17 (TX 10).

\*　　\*　　\*　　\*　　\*　　\*

This order now assumes, in the alternative, that the September 1 letter was reasonable. On that assumption, it is necessary to assess whether Mr. Marticorena's twin follow-up requests on November 2, 1998, were reasonable. As related above, the parties jointly have referred to one such letter as the second additional "information request" (TX 11). The other November 2 letter laid out a demand for a due diligence study to be paid for by Charter (TX 12).

Turning to the "information request" (TX 11), Mr. Marticorena's letter was 7–1/2–pages long, single-spaced, with 31 items of inquiry (counting subparts). *First*, it included a set of follow-up questions based on a materially faulty set of conclusions erroneously drawn by Mr. Marticorena from Charter's financial projections submitted on September 17. Those seven questions were all grounded in Mr. Marticorena's mistake. In essence, he accused Charter of projecting results that it had never projected. No excuse for his errors was offered at trial. *Second*, many of the questions would have required Charter to go out and locate third-party sources of information and then to vet its internal projections against such external data. While some smaller number of such cosmic questions might conceivably have been reasonable in more limited circumstances, the large number actually propounded and the bone-crushing work the answers would have entailed rendered them unreasonable in scope. The foregoing are merely illustrative of the problem. It is worth noting that no contention was made that the earlier answers were not complete or accurate. In the entire letter, only nine questions were reasonable in the Court's view. They were follow-up questions, tucked away at page 7, asking for clarification of certain discrete aspects of the September 17 submission. They were buried among the debris of improper questions.

The letter tried, moreover, to resurrect the issue of Charter's technical qualification by asking for production as far out as a decade, among other things, of employment contracts for top management (TX 11 at 6–7). This issue had already been procedurally foreclosed by the failure of Mr. Marticorena to raise an objection to technical qualification within the thirty-day period. Further as to timing, the request came on Day 76 in the 120–day timeline and 46 days after the September 17 submission. To have waited until November 2 to propound such a massive assignment violated the rule of reason. In short, the

second information request was unreasonable both as to scope and as to timing.

Turning to the separate due diligence demand also dated November 2, this order does not rely on the issue of its timing because Ms. Foushee's ambiguous responses might well have led Mr. Marticorena reasonably to believe that a study would be considered, at least for part of the period up to November 2. Independently of timing, however, the issue remains under the 120-day rule whether the *scope* of the proposed study was reasonable. This order holds that the proposed scope was unreasonable.[5]

In a transaction where the threshold issues of financial, legal and technical qualifications were established, it was unreasonable to launch a sweeping inquisition into the equity economics of a nationwide cash purchase of cable companies, into whether the buyer paid "too much," and into estimating future rates of return on investment as far out as ten years, among other financial questions, in order to divine whether the new owner might, in future years, seek to raise rates or to cut service. Due diligence studies are extremely rare in Form 394 proceedings. Mr. Marticorena seems to be the only one to have required one before. The normal fear is that the cash flow would not cover the debt service and then a bank would have to take over. That fear was absent here. Here, there was no new debt. There was, in fact, going to be less debt. Rate increases and service cuts, moreover, are not the only way to improve one's rate of return. Improving service and increasing subscribers are just as plausible. Every company tries to maximize profits regardless of how much equity is originally invested. Each investor has different expectations of a fair return. Tax considerations, strategic positioning, and private beliefs about where the economy may be headed, inform investment decisions. Granting that an LFA has the right to make reasonably detailed inquiries into the extent to which a change of control would impact rates and/or service, the connection between Mr. Allen's future return on investment over ten years and any future impact on rates and service was simply too remote and tenuous to qualify as reasonable additional information in an expedited process limited to 120 days -- all the more so to the extent the demand was not for information but for submission to a third-party process and investigation. Accordingly, Charter was not required to honor the November 2 requests and the 120-day clock was not tolled as a result of Charter's failure to do so. The County's resolution denying the change of control on this ground was unreasonable and unlawful.[6]

### The Federal Statutory Cap on Franchise Fees

■ As a substantive matter, the demand for Charter to pay the cost for a due diligence study violated the Cable Act. Section 622 of the Cable Act imposes a five-percent cap on cable franchise fees collected by LFAs, stating in relevant part:

> For any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such pe-

5. Ms. Foushee's ambivalence over the due diligence study was not a reasonable excuse for Mr. Marticorena delaying his second information request. The letter was separate and apart from the due diligence study. Mr. Marticorena should have propounded the information request much sooner, given the 120-day window, and the need to receive any information soon enough to be read and understood by Mr. Marticorena and the County staff.

6. The local Santa Cruz ordinance, incorporated by reference in the agreement, contemplated an even shorter fuse – sixty days. Viewed in light of the shorter time line contemplated by the local ordinance, the information request and due diligence study demands were all the more unreasonable in scope. Since the ordinance is the source of the requirement not to unreasonably withhold consent, the sixty-day window set by the same ordinance (indeed, same paragraph therein) lends meaning to the scope of information contemplated.

riod from the operation of the cable system to provide cable services.

47 U.S.C. 542(b).[7]

 The courts have generally held that requirements that operators reimburse consultant and legal fees are deemed to be franchise payments. Accordingly, when a local government's franchise already requires the maximum franchise fee, imposing payment for consultant fees violates the cap. In *Time Warner Entertainment Co. v. Briggs*, Civ. A. No. 92–40117–GN, 1993 WL 23710 (D.Mass. Jan.14, 1993), the court found the following provision of the local cable-licensing law unenforceable and preempted by the Cable Act:

> All charges and fees incidental to awarding, renewing, extending and/or enforcing the License, including, but not limited to, ... reimbursement to the Town for legal advertising, attorney's fees, consultant's fees ... shall be paid by the Licensee.

*Id.* at \*5. The court found that the consultant and legal fees provision was preempted by the Cable Act and granted summary judgment for Time Warner on that issue:

> Apparently, there is no dispute among the parties that, under the Licenses, Warner Cable will be required to pay five percent (5%) of its gross revenues to the Towns in franchise fees ... Any additional franchise fee imposed by the Towns will exceed the maximum allowable fee. By requiring Warner Cable to reimburse them for attorney's and consultant's fees, the Towns impose a "franchise fee" on Warner Cable, as that term is defined in 47 U.S.C. § 542. Consequently, inclusion of the words "attorney's fees, consultant's fees" in Section 6 of the Bylaws contravenes fed-

eral law, and, therefore, those words are preempted and declared unenforceable.

*Id.* at \*6.

Similarly, *Robin Cable Systems, L.P., v. City of Sierra Vista*, 842 F.Supp. 380 (D.Ariz.1993), held that the city's demand for up to $30,000 for franchise "processing costs," coupled with the city's five-percent fee, required summary judgment for the cable operator:

> Section 2.2 of the Agreement [the franchise fee] is a permissible. fee to be charged under 47 U.S.C. § 542(b). Section 2.3 of the Agreement, however, appears to violate the Cable Act. The term "franchise fee" is defined broadly to include "any tax, fee, or assessment of any kind imposed by a franchising authority or other government entity on a cable officer or cable subscriber ..." 47 U.S.C. § 542(g)(1). The exceptions listed under 47 U.S.C. § 542(g)(2) are narrowly tailored. Section 542(g)(2)(D) allows a municipality to make charges "incidental to the awarding ... of the franchise ..." 47 U.S.C. § 542(g)(2)(D). A fee of up to $30,000 is more than incidental. Any substantial fee charged on top of the annual license fee is inconsistent with the Cable Act.

842 F.Supp. at 381. *See also Birmingham Cable Communications, Inc. v. City of Birmingham*, Civ. A. No. CV 87–L–0755–S, 1989 WL 253850 (N.D.Ala.1989) (granting cable operator summary judgment, where city attempted to require cable operator to pay for the city's consultant costs).[8] These cases dealt with renewal fees, not transfer fees, but there is no logical basis for treating them differently.

---

7. Section 542(g)(1) of the Cable Act defines "franchise fee" broadly:

 [T]he term "franchise fee" includes any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such.

8. *Birmingham Cable* ordered the city to comply with 47 U.S.C. 542(b):

> Plaintiff is entitled to apply for and may obtain renewal of its cable television franchise in Birmingham, Alabama, *without having to pay or to agree to pay, above and beyond the Cable Act five percent franchise fee, the city's franchising expenses, consultant costs, or any other regulatory costs or fees.*

1989 WL 253850 (N.D.Ala.1989) (emphasis added).

Here, the County demanded that Charter provide and pay for a study by an independent financial consultant. The November 2 letter from Mr. Marticorena, for example, requested an outside financial consultant report prepared at "the sole cost and expense of" the plaintiffs (TX 33, TX 12). The estimated fee of the report was $39,000. The franchise agreement already imposed upon Charter the maximum annual five-percent franchise fee (TX 3 at 1798). Thus, the County's requirement that Charter pay for the fee of an independent financial consultant violated the statutory cap.

The County argues that a funding requirement is lawful. The Act defines the term "franchise fee" to include ". . . any tax, fee, or assessment of any kind imposed by a franchising authority . . . on a cable operator . . . solely because of [its] status as such." 47 U.S.C. 542(g)(1). The Act exempts from the limitation any "requirements or charges incidental to the awarding or enforcing of the franchise, including payments for bonds, security funds, letters of credit, insurance, indemnification, penalties, or liquidated damages." The specific examples in the 1984 Act of such requirements or charges are illustrative and not exhaustive.

Nonetheless, a fee for outside consultants to prepare analyses that would ordinarily be done by county or municipal staff is not like the illustrative examples given. The record shows that due diligence studies are virtually unknown in the transfer of franchises. Usually, the LFAs themselves are able to understand and analyze the submissions. That would be the normal expectation and the backdrop against which the statute was passed. The record shows nothing so unusual about the instant acquisition as to indicate an ordinary LFA could not understand it. It was illegal for the County to impose the requirement to pay the consultant fee (regardless of how the consultant was picked).

The County argues that, on the facts, it dropped the demand for paying for a due diligence study. Until November 2, however, there is no doubt that Mr. Marticorena was demanding a pre-fund fee for his own consultant candidate, Mr. Morgan. One of his two November 2 letters (TX 12), however, altered course slightly. Instead of funding Mr. Morgan, Mr. Marticorena insisted on funding an "independent financial consultant." In substance, however, there was no difference between the old and new approaches. In both cases, the fee would come out of Charter's pocket for an outside independent expert. Either version constituted a proscribed fee.

Contrary to the County's argument, it is simply not true that the board's denial resolution was not based on the refusal to pay for a due diligence study. When one reads the actual resolution, it becomes apparent how wrong the County's contention is. A whereas clause recited that the "County requested certain information . . . relating to . . . the financial ability of the Buyer to generate sufficient cash flow to meet debt and obligations, satisfy capital expenditure obligations, and provide a reasonable return of and on its investment." Moreover, the same recital referred to and incorporated by reference the same November 2 letter quoted above in the due diligence study wherein Charter was to supply a due diligence study "at the sole cost and expense of the Seller and the Buyer," which letter was appended physically to the resolution. The next recital then stated that the applicants had "unreasonably delayed or refused or failed to provide a material portion of the requested additional information." Following the recitals, the action resolved specifically that the applicants had failed or refused to cooperate with "County Staff, Special Counsel, and outside consultants retained by the County in undertaking the due diligence investigation of the Transfer." If the "outside consultant" was not Mr. Morgan, then who was it? It further resolved that the applicant had failed to supply all necessary information requested by the County and had "failed to provide any independent corroboration or justification

for its income projections." Plainly, this was a reference to the independent study. The resolution is further permeated with references to rate of return and the financial projections. To say that the failure to pay for a due diligence study was not a basis for the denial resolution is palpably wrong.

Lastly, the County argues that the due diligence study already done at Mr. Allen's request by NationsBanc–Montgomery Securities would have filled the bill at no extra expense and was wrongly withheld. Perhaps it was called for by the massive document requests. So was everything else. It was understandable that Ms. Foushee finally threw up her hands and stopped trying to satisfy Mr. Marticorena's ever-mounting, never-ending stream of all-embracing information requests. Charter did not act unreasonably in failing to discover that Mr. Allen had had the document all along. Most significantly, the Court is clear that the NMS report fell far short of the independence dictates of Mr. Marticorena's November 2 letter and that it did not cover all the required substantive elements stated by him (TX 12). Even had it been provided, therefore, Mr. Marticorena could have pointed to his own November 2 letter to justify the NMS shortcomings.

In short, the denial resolution and the County's entire course of conduct were based in part on an illegal consideration, the demand that Charter pay for an independent due diligence study in the range of $39,000, a demand that contravened the five-percent statutory cap. To the extent the board denial was based on this ground (and it was), the denial was illegal.

### The $500,000 Mitigation Fee

■ The $500,000 mitigation fee demanded by Messrs. Marticorena and Busch at the Clift Hotel meeting pursuant to board resolution (TX 16) was blatantly illegal – a further violation of the five-percent statutory cap. The County does not really argue otherwise but contends the demand was cloaked in a "settlement" privilege. On the facts, the Court rejects this contention. Mr. Marticorena was skilled at reducing to writing "negotiation agreements" and onerous waivers. There is no documentation of any privilege agreement. The evidence of the board resolution imposing the condition did not say it was secret, privileged, or confidential (TX 16). The Court disbelieves Mr. Marticorena's and Mr. Busch's testimony that there was an oral privilege agreement at the Clift Hotel.

### Extension of the Rate Freeze

■ Another condition imposed at the Clift Hotel meeting was an extension of the freeze period. Recall that the Sonic transfer approval had imposed a two-year rate freeze pending completion of a rebuild. The December 15 board resolution and the Clift Hotel demands insisted on extending the freeze. This was illegal too. Federal law had in place rate-making procedures that gave rights to operators to justify rate increases and restricted LFAs' rights to regulate rates. 47 U.S.C. 543(a)(1).[9] As the FCC stated in Footnote 38, "It should be emphasized, however, that in exercising their transfer jurisdiction, franchising authorities may not seek to circumvent the Commission's authority over rate regulation, franchise fees or oth-

---

**9.** In a cable system not subject to effective competition, an LFA may regulate rates for the least expensive tier of cable service, "basic service," pursuant to FCC rules and regulations. 47 U.S.C. 543(a)(2)(A) and b; 47 C.F.R. 76.922. Rates for other tiers of cable programming service, however, were subject to regulation only by the FCC pursuant to 47 U.S.C. 543(c)e. 47 U.S.C. 543(a)(2)(B); 47 C.F.R. 76.922. Under FCC regulations, cable operators could justify rate increases in either basic service or upper-tier rates under certain circumstances, such as "inflation, changes in the number of regulated channels on tiers, or changes in external costs." 47 C.F.R. 76.922(c)(2). Additionally, federal upper-tier rate regulation was "sunsetted" in 1996, Pub. L.N. 104–104, § 301(b)(1)(C)(4), 110 Stat. 56 (1996), to end on March 31, 1999. 47 U.S.C. 543(c)(4). An LFA may not try to circumscribe a cable operator's rights under this federal law. 47 U.S.C. 543(a)(1).

er matters." 1993 FCC Order at 6834, n. 38. Santa Cruz County, Mr. Marticorena and Mr. Busch tried to do exactly what Footnote 38 and federal law prohibited.

Accordingly, both conditions (the freeze and the half-million dollar mitigation fee) violated federal law. They thus could not be reasonable, and the County's permission to the transfer was "unreasonably withheld" in violation of the Santa Cruz cable ordinance, as incorporated into the franchise agreement.[10]

### The First Amendment

Finally, this order holds that the refusal to consent violated the First Amendment. The operation of a cable television franchise "plainly implicate[s] First Amendment interests." *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 494, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986). Under *United States v. O'Brien*, a content-neutral government regulation that results in an incidental burden on First Amendment freedom is sufficiently justified if:

it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The government bears the burden of showing that the asserted state interests are real, not merely conjectural, and that the government regulation will in fact address those interests in a direct and material way. *Edenfield v. Fane*, 507 U.S. 761, 770–71, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), *quoted in Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S.

622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). In the cable context, the Supreme Court has explained that:

[t]o satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests. "Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" ... Narrow tailoring in this context requires, in other words, that the means chosen do not "burden substantially more speech than is necessary to further the government's legitimate interests."

*Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (quotations omitted).

Plaintiffs suggest that the only possible important or substantial governmental interests that local regulation of a cable operator may further are protecting public safety and maintaining public thoroughfares, for example by minimizing the physical disruption of the public domain that may occur if a cable company lacks the technical or financial resources to install and maintain a cable system safely and expeditiously. Such interests in ensuring cable operators' qualifications and regulating their infringement on public rights of way have been recognized in several cases cited by the parties. *See, e.g., Telesat Cablevision, Inc. v. City of Riviera Beach*, 773 F.Supp. 383, 394 (S.D.Fla.1991) (citing *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 495, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986)); *Group W Cable, Inc. v. City of Santa Cruz*, 669 F.Supp. 954, 966, 971 (N.D.Cal.1987); *Pacific West Cable Co. v. City of Sacramento*,

---

**10.** Plaintiffs contend that Mr. Marticorena and Mr. Busch planned all along to raise marginal concerns and eventually to trade them off for illegal considerations, such as the half-million-dollar fee. The information requests, plaintiffs contend, were a mere cover for raising marginal concerns, and thus were unreasonable for this additional pretextual reason. There is plausible evidence, including testimony as to Mr. Marticorena's modus operandi in earlier transfers, to support this theory (and plausible counter evidence). In light of the foregoing disposition, however, it is unnecessary to reach the issue.

*California*, 672 F.Supp. 1322, 1335–36 (E.D.Cal.1987); *Carlson v. Village of Union City, Michigan*, 601 F.Supp. 801, 810–11 (W.D.Mich.1985) (citing cases).

It is wrong, however, to say that there is no other legitimate interest that can justify government regulation of a cable operator under *O'Brien*. The Supreme Court has identified such important or substantial governmental interests as "protecting non-cable households from loss of regular television broadcasting service due to competition from cable systems," "assuring that the public has access to a multiplicity of information sources," and "eliminating restraints on fair competition," *Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622, 663–64, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), as well as raising revenue through a tax that is not directed at and does not present the danger of suppressing particular ideas, *Leathers v. Medlock*, 499 U.S. 439, 453, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991). Other courts have recognized important or substantial governmental interests in the cable context, including regulating physical scarcity, *Telesat Cablevision*, 773 F.Supp. at 394, 397; ensuring equal and uniform cable service, *Pacific West Cable Co.*, 672 F.Supp. at 1337; fostering local community participation, choice, expression, and communication, *Chicago Cable Communications v. Chicago Cable Commission*, 879 F.2d 1540, 1549–50 (7th Cir.1989); *Telesat Cablevision*, 773 F.Supp. at 412; fostering employment opportunities for local residents, *Chicago Cable Communications*, 879 F.2d at 1550; *Telesat Cablevision*, 773 F.Supp. at 412; protecting consumers from monopoly pricing, *Time Warner Entertainment Co., L.P. v. Federal Communications Commission*, 93 F.3d 957, 967 (D.C.Cir.1996), and even the interest (derived from those primary interests) of "allowing municipalities to regulate cable operators without fear of potentially overwhelming damages awards," *Jones Intercable of San Diego, Inc. v. City of Chula Vista*, 80 F.3d 320, 326 (9th Cir.1996).

This order does not endorse all of these interests as legitimate under *O'Brien*. Although some courts have recognized these interests, others have rejected some of them. *See, e.g., Century Federal, Inc. v. City of Palo Alto, California*, 648 F.Supp. 1465, 1476–77 (N.D.Cal.1986). Certainly many of them are not applicable here. Nonetheless, they are illustrative of the narrowness of plaintiffs' contention that the County's only possible legitimate interest in the cable context is in regulating its physical rights of way.

That the County's interests are not so limited is only the beginning of the inquiry, however. Whether the County *could have* legitimate interests in regulating the cable industry and whether the County *has shown* such interests in this case are different questions. As plaintiffs note, defendant has not proffered evidence that any interest in protecting public safety, maintaining public thoroughfares or minimizing disruption of the public domain justifies the County's information demands in this case.

The County asserts an interest in ensuring continuity and quality of cable service to the franchise. In theory, this constitutes a legitimate government interest. The First Amendment would allow an LFA to deny an application based on substantial evidence of lack of financial or technical qualification to operate a cable system. The denial resolution in question purported to deny consent on the ground that Mr. Allen had not shown that he was "financially qualified" (TX 15 at 2).

The denial was plainly wrong on this point. The materials submitted by Charter showed Mr. Allen's substantial net worth. To this, the resolution merely argued that wealth was not enough. Rather, the resolution claimed it was "also necessary to evaluate the economic reasonableness of the transaction to determine whether the transaction will impose unreasonable financial burdens upon the purchaser" (*id.* at 3–4). To have said that Mr. Allen was not "financially qualified" merely because, in his business judgment, the

company was worth more than others were willing to pay was a play on words.[11]

The issue again boils down to whether it was lawful to hold up the transfer over the supposed long-term implications of the economics of the acquisition. If plaintiffs could not glean a profitable rate of return, the County reasons, rates might be raised and service could plummet or even cease. Hypothetically, if an existing cable operator were to attempt a transfer of the franchise to company revealed to be heavily leveraged with debt and with no track record of success, an LFA might well seek to clarify whether the proposed operator were indeed likely to crater if rates were not raised. Preventing such an eventuality would qualify as an important or substantial government interest for purposes of the First Amendment. Protecting cable subscribers from loss of service due to reasonably foreseeable failure of a cable operator is closely related both to the government interests articulated in *Turner I* and those underlying the Cable Act. This would be true regardless of whether federal law or an existing rate order would prevent a rate increase, as plaintiffs argue. If a cable operator were unable to provide decent service, subscribers would unlikely be comforted by rate guarantees.

This case, however, presents the opposite factual extreme from that hypothetical scenario. The transaction was to be accomplished without taking on any new debt; there was no realistic risk of default or of a bank having to take over; in fact Charter's existing debt was to be paid down. The company had a strong track record. The company's financial viability, years into the future, simply could not stand or fall based on the immediate nationwide acquisition price. Mr. Allen may have been willing to pay more than others because of strategic considerations or because of tax considerations or because of keen interest. Regardless of the equity invested, Mr. Allen, like any other rational business, would presumably seek to maximize profits. A company with less equity will seek to maximize its profits just as a company with more equity will. To say that the company would be under "financial stress" because it wishes to maximize profits would draw into question the financial viability of every enterprise in America. That a company will cut service or increase prices in order to maximize profits is no more likely than improving service and expanding the customer base. Absent reasonable doubt over whether the cash flow would cover debt service and payroll and other necessities of operation, it would be hard to see any basis for questioning viability. The extreme economic fears expressed in the denial resolution were grossly disproportionate to the actual risks. The County has not met its burden of showing that any substantial government interest would be achieved less effectively absent the information demands. *See Turner Broadcasting*, 512 U.S. at 662, 114 S.Ct. 2445.

The problem was exacerbated in this case by the fact that the Santa Cruz cable ordinance contained no standards whatever, either substantively or procedurally, other than to say consent might not be "unreasonably withheld." The County gave its agents unfettered discretion to scour transactions for concerns. No notice was given as to what might constitute

---

11. As for technical qualification, the resolution claimed that "no evidence has been presented by the Applicants as to the Buyer's contractual commitment ... to maintain existing Charter management and/or operating policies and procedures." In the original submission, however, the CEO of Charter, Mr. Kent, had stated to Santa Cruz County that he would remain: "The current corporate staff and system management will remain under my leadership" (TX 6 at 762). The resumes of top management were included in the submission. By failing to object to the accuracy of this statement within thirty days, the County forfeited the right to challenge it later on under 47 C.F.R. 76.502(b). The denial resolution, however, did exactly that, assuming that top management would exit and leave Mr. Allen, who had no "track record," in charge. It was unlawful under the 120-day rule for the County to raise the untimely challenge to the technical qualification of the company post-acquisition.

**1218**

grounds for denial or subjects for investigation. Instead the County agents made up the rules as it went. Such "regulation" lends itself to the suppression of speech.

 Here there were not even vague standards. There was no standard at all. Vague or nonexistent standards "[f]irst, . . . may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, . . . may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales,* 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). Standards of permissible statutory vagueness are strict in the area of free expression. *National Association for the Advancement of Colored People v. Button,* 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Here, the County's ad hoc regulatory approach both prevented plaintiffs from anticipating and complying with the County's demands and, of equal importance, failed to restrict possible arbitrary conduct. The boundless nature of this regulation reinforces the conclusion that the County's approach burdened substantially more speech than was necessary to further its legitimate interests.

### CONCLUSION

In sum, the County had promised in its franchise agreement that it would not unreasonably decline to consent to any change in ownership of the franchise. For the reasons stated, the County violated that promise. Its refusal to consent was unlawful on multiple grounds and was therefore unreasonable. Plaintiffs are entitled to declaratory judgment that the County violated the franchise agreement and the First Amendment in refusing to consent to the change in ownership. No further issues requiring disposition, the Clerk shall close the file and judgment shall be entered accordingly.

**IT IS SO ORDERED.**